RENGA v. DARLING.

1. FRAUD — EVIDENCE — SUFFICIENCY—DIRECTED VERDICT PROPERLY
   REFUSED.
   In an action for damages for fraud in the sale of a farm
   to plaintiffs, refusal of the trial judge to direct a verdict
   in favor of defendants, held, justified under the record.[1]

2. SAME—TENDER—INFERENCES.
   Where the jury found from the testimony that plaintiffs
   tendered back to defendant husband a deed of the farm,
   which he refused to accept, held, a fair inference therefrom
   that a tender of the personal property, which was left
   on the farm by plaintiffs or in the care of neighbors,
   would also be refused, and therefore no bar to commence-
   ment of this action.[2]

3. SAME—TENDER—TRIAL—INSTRUCTIONS.
   In view of the fact that defendant wife was not a party
   to the original contract, that defendant husband con-
   ducted all of the negotiations, and that all of the repre-
   sentations as to the value of the farm were made by
   him, although the deed came from her, a requested in-
   struction that a tender of a deed to defendant husband
   is not a tender to his wife and that she was not bound
   thereby, held, properly refused.[3]

4. APPEAL AND ERROR—JUDGMENT MAY NOT BE REVERSED UNLESS
   ERROR HAS RESULTED IN MISCARRIAGE OF JUSTICE.
   Under 3 Comp. Laws 1915, § 14565, where it does not
   affirmatively appear that the error complained of has re-
   sulted in a miscarriage of justice, the judgment may not
   be set aside or reversed.[4]

Error to Van Buren; Des Voignes (L. Burget), J.
Submitted October 17, 1924. (Docket No. 113.) De-
cided December 10, 1924.

Case by Joe Renga and another against James P.

---

[1]Fraud, 27 C. J. § 208; [2]Id., 27 C. J. § 130; [3]Id., 27 C. J. § 130
(1926 Anno); [4]Appeal and Error, 4 C. J. § 3190.

Darling and another for fraud in the sale of a farm. Judgment for plaintiffs.    Defendants bring error. Affirmed.

*William J. Barnard,* for appellants.

*Thomas J. Cavanaugh,* for appellees.

MOORE, J.    The plaintiffs claimed to have been defrauded in a land deal with defendants.    They brought this suit to recover damages.    At the close of the testimony a motion was made on the part of the defendants for a directed verdict.    This motion was overruled and the jury returned a verdict in favor of the plaintiffs in the sum of $1,662.50.    The case is brought into this court by writ of error.

We quote from the brief of the defendants:

"Points relied upon for reversal:

"(1) Error in the court refusing to direct a verdict for the defendants.

"(2) Errors in refusing defendants' request to charge."

A recital of the claims of the parties is essential to pass upon the questions presented by counsel.    The plaintiffs are Italians who were residents of Chicago. They were owners of a lot in that city which they claim cost them $1,385, and had $500 in the bank.    It is their claim, in substance, that an Italian real estate agent visited them and urged them to get a farm in Michigan, stating it would be better for them and their children than living in Chicago.    That he later was accompanied by James P. Darling, who represented that he had nine or ten desirable farms in Michigan; that the result of these talks was that Mr. Renga went to see the farms.    Mr. Renga testified through an interpreter, we quote some of his testimony:

"I go see the farm.    I go cross big barn I find there.

Want me to go see the farm.    I go back of barn and see land.    Land got stone and sand.    He says the land is good clay sand and when we went over we find this farm.    He said it worth $5,000.    Net $700 a year.    Grow beans, corn, hay and potatoes and could raise onions, celery and cabbage.

"Q. Did he tell you what the farm had produced in the past?

"A. No, he says it would be $700 net to him.    At the farm he said it was a fine farm, good farm, best in this country.    *    *    *    Darling went over to the farm with me and Artuso.    Artuso talks my language and English language.    Yes, sir.    We went to dinner. After dinner we went to see other farms.    We went home and went back to Chicago after it got dark. *    *    *    I didn't see Darling again until I give him a $200 deposit in Darling's office.    Artuso was there."

Paper marked Exhibit A, which reads as follows:

"Agreement, Made this 22d day of August 1921 by and between James P. Darling, of Branch, Michigan, and Joe Renga and Gina, his wife, of Chicago, Illinois, are to purchase the one hundred and twenty-acre farm, Oceana county, as the Griswold farm in Ruby creek settlement, for four thousand seven hundred dollars. Five hundred in cash, one lot in 58th street near Roosevelt road, to be clear of debt, and special assessments and to give a real estate mortgage of three thousand two hundred dollars, making in all $4,700, and to have one pair of horses, 4 pigs, harness, wagon, plow, cultivator, drag, hay rake, mowing machine, corn planter, potatoe planter, and to have one-half of the corn, beans, and millet grown on the farm this year and 2 cows, 2 calves, 25 chickens and interest to be paid semi-annually, and one hundred dollars a year or more to be paid on the principal, and all in ten years and Darling to have pasture to use this season for what cattle is on farm, and to have all fence posts, lumber and wood cut and piled on the farm, and to have his own time to take it away from the farm.    This deal is to be closed by said parties all to have a good title to property and two hundred dollars paid this day to James P. Darling, to show good faith in taking said farm, and if said parties, Joe and Gina (his wife), fail to close said deal, they

forfeit sum as earnest money and are to go to Michigan to Hart with me this week, Darling, and get good title to same, and get a guaranty policy for lot and all personal and real estate to be in same deal.   These agreements not to be recorded.   It is also agreed that two hundred dollars is to be paid in one year in addition to the amount agreed on above.   When $600 is paid on the principal the chattel mortgage will be released.

> "JAMES P. DARLING,
> "JOE RENGA."

After Mrs. Renga went to the farm Mrs. Darling made a deed of it and $300 was paid.   There was no mention of the personal property in the deed.   A note and a mortgage was given back on the farm for $3,200, and a chattel mortgage was given for a like amount on personal property and the growing crops.

It is claimed that Mr. Renga remained at work in a factory in Chicago where he was earning $5 a day, until in February; that his family were sent over to the farm in September.   The oldest boy at this time was 13 years old.

It is the claim of plaintiff that he was to have a team of seven-year old horses; that when he got on the farm he found a team twenty-five years old and that he went to get a load of wood "and one of the horses fell right down in the front yard and died." The testimony indicates the other horse died a little later.

It is the claim of plaintiff that he was not acquainted with farm values, but that he soon found out the farm was not as represented, and when he told Mr. Darling so he was assured Darling could and would sell the farm.   We again quote:

"Darling came out while I was there.   Yes, sir. A couple of times a month.   He was staying then in Chicago.   I had a talk with him about the farm he sold me.   He said he had a prospect to sell the farm. He said it was a man in Chicago.   He said he was

229—Mich.—13.

going to sell the farm for $5,000.    I talked with him every time he come home about that farm."

Finally it is the claim of the plaintiffs that a quitclaim deed was prepared and tendered to Mr. Darling. We quote from Mr. Renga again:

"*A.* The deed was sent to my wife up north.    Yes, sir.

"*Q.* And when it came back what did you do with it?

"*A.* This deed when it come back here he produced this deed to Darling and Darling says 'You keep that deed.    I got your money and you keep the deed.' "

Mr. Darling testified there was no tender made. The court submitted a special question as follows:

"Did Joe Renga on or about the 2d of July, 1923, offer the deed Exhibit G, to James P. Darling at the Dyckman House corner in the village of Paw Paw?

"Answer.    Yes."

Mrs. Renga and her oldest son were sworn as witnesses and testified as to representations made about the value of the farm and about the personal property substantially as the husband testified, and about the conditions they found at the farm, and what happened after they got there, and that some of the personal property was left at the farm when they abandoned it, and the rest was left with a neighbor so it would not be stolen.

Other witnesses were sworn on the part of the plaintiffs as to the value of the farm and personal property.    One of them testified that he rented the farm before it came to Mr. Renga for $25 a year, and that $1,200 would be a big price for the farm.    Another witness who had a farm joining this one testified that its market value was not over $1,500.

The defendants had one witness who lived 150 miles from the farm who expressed the opinion, we quote:

"For loan purposes the farm is worth $3,200.    It should sell for $3,600 in 1921."

Another witness brought some dirt into court in a bottle which he said came from the farm. Another witness who had a pool room and barber shop testified: "The soil is sandy loam and some clay mixture in it and muck and some rocks."

Mr. Darling denied he had made any false statements, and testified that the "farm was well worth $4,000, the bare farm."

It may be well to quote some of the testimony of himself and wife:

"My business is farming. I buy farms and fix them up; sell and trade them when we get our price for them. I haven't got any office. I spend my time in different offices in Chicago. Sometimes I am in Artuso's office. Once in a while a day; maybe a half hour at a time in Patterson's office. H. A. Stone's and C. V. Burnett's and Juvanaugh's and there are a lot more there that I don't exactly know who owns the office. Deal with all those fellows. I make different deals with different ones. They are engaged in the real estate business. Yes, I spend some of my time in Chicago and handle my wife's and my own property in the way of sale and exchange. I don't have a license in Michigan. * * * Went with her (Mrs. Renga) over to Hart. Had an abstract of the property. Yes, sir. Artuso said it was all right after examining everything; said that to Mrs. Renga. I don't know whether he is a lawyer or not; I don't know that he is. He is not a Michigan man. I got $550 in money and a mortgage of $3,200. Yes, sir. She paid the $16 mortgage tax. Mr. Artuso did for her. I paid for the recording of the mortgage. Yes, sir, I think I got a receipt for it. * * *

"When I made the contract didn't have any horses. No, I don't usually. If a farm hasn't got stock on when I agree to put stock on I generally put on what I agree to. Some of them has stock on and some hasn't. * * * No team was specified in the contract in particular. The mortgage was taken on one pair of horses and would be on whatever team I bought for them. I had a set of work harness. * * * In fact all this dealing back and forth in land and where the title was taken back in my wife, those deals

were all made by me and through me.    Naturally she
would consult me.    I done a portion of the deal but
not all of it and I had to consult first with my wife
on the property she owned; whether she would let it
go or not.    *    *    *

"I don't remember the date my wife got the deed
of that 120 acres.    I didn't ask her.    I think it was
in 1920.    The deed was made out to her.    I got
it from Griswolds first; then I deeded it to my wife.
Yes, sir.    I paid $1,200.    I don't remember how long
I had it; a few months before I deeded it to my wife
and my wife sent the deed and mailed it to record."

We now quote some of the testimony of Mrs.
Darling:

"*Q.* From whom did you get this land?
"*A.* I bought it of my husband.
"*Q.* When?
"*A.* Well it was, I think, in the spring of 1900.    No,
in the fall, I won't say just when it was, but any way
I bought it.    I know that.    *    *    *
"*Q.* Well, give me some idea when you bought this.
"*A.* When he got ready to sell it and when I got
ready to buy it.
"*Q.* Oh that is fine of you.    How did you pay for it?
"*A.* I paid for it with money.    *    *    *
"*Q.* Money that you counted out, did you?
"*A.* Yes, sir.
"*Q.* All right, how much did you pay him?
"*A.* $3,000.
"*Q.* Did you know what he paid for it?
"*A.* Yes, sir.
"*Q.* He told you, did he?
"*A.* I knew what he paid for it.
"*Q.* Where did you get the $3,000 from that you
counted out to your husband?
"*A.* It was money that I had in the house.
"*Q.* In the house?
"*A.* Yes, sir.
"*Q.* In a drawer in the house?
"*A.* No matter where I had it in the house, I had it.
"*Q.* Well, I am trying to find out.    Could you tell
me where it was in the house?
"*A.* I don't tell everybody where I keep my money.

"*Q.* No, I see, but you went in somewhere and you got a pile of money—

"*A.* I had the money—

"*Q.* You got a pile of money and you brought it out on the table.    You counted out $3,000 to James P. Darling?

"*A.* No, sir, it wasn't on the table.

"*Q.* Well, where was it then?

"*A.* Counted it out by ourselves.    No one else was around.

"*Q.* Where was it?    Was it in the house?

"*A.* Yes, sir.

"*Q.* In the bed room?

"*A.* Likely.

"*Q.* Don't you remember?

"*A.* Yes, sir.

"*Q.* Was it in the bed room?

"*A.* Yes, sir.

"*Q.* Did you have the money in the bed room?

"*A.* I did at that time.

"*Q.* How long did you have it in the bed room?

"*A.* Well, I carried it in there.

"*Q.* Well, how long did you have it in your possession in the house?

"*A.* I kept the money and gathered it from time to time and had it myself.

"*Q.* That is a fact, is it?

"*A.* Yes, sir.  *   *   *

"*Q.* Who negotiated those deals for you?

"*A.* Mr. Darling attended to the business part of it.    I am not so very well versed in business affairs and he looks—understands taking the business and handling the business better than I, but he always consults me.

"*Q.* Yes, in the final show down?

"*A.* Yes, and if I think it is a proper thing to do I tell him to go on and make out the contracts, but I always tell him—I always do my own signing.  *   *   *

"*Q.* And so far as looking after this property is concerned—the Renga farm I am speaking about—that was your husband's business wasn't it?

"*A.* Principally, yes.

"*Q.* He did all the talking and negotiating and everything that there was about it?

"*A.* Yes, sir.  *   *   *   I have owned several farms

in years past.    We have bought and sold ever since we have been married for 24 or 25 years.    We have made profits on our transactions.    We wasn't doing business for our health."

Great stress is put by counsel for the defendants upon the fact that the personal property was not tendered back.    It has already appeared that the horses died.    The testimony of Mr. Darling is that the two cows were returned to him.    The testimony offered on the part of the plaintiffs is that what personal property was left was either left on the farm or with a near neighbor for safe keeping.    If Mr. Renga's testimony is true that Mr. Darling refused a tender of the deed, is it not a fair inference that a tender of the personal property that was left would also be refused?    See *Wright* v. *Dickinson*, 67 Mich. 580 (11 Am. St. Rep. 602) ; *Munzer* v. *Stern*, 105 Mich. 523 (29 L. R. A. 859, 55 Am. St. Rep. 468) ; *American Trust & Savings Bank* v. *Moore*, 161 Mich. 436 (137 Am. St. Rep. 518) ; *Snyder* v. *Markham*, 172 Mich. 693.

Counsel insist it was reversible error to refuse the following request:

"You are instructed that an offer or tender of the deed to James P. Darling is not a tender of the same to Alta M. Darling and she is not bound by any claim tendered, if any such was made."

It has already appeared that Mrs. Darling was not a party to the original contract.    She took no part in the negotiations.    The jury have found that the tender of a deed was made to Mr. Darling who was the man who made the original contract, who made all the representations and negotiations.    The money, according to his testimony, was paid to him.    The mortgages and notes were delivered to him.

We have quoted from the testimony of Mr. and Mrs. Darling their way of conducting their business.

Section 14565, 3 Comp. Laws 1915, reads:

"No judgment or verdict shall be set aside or reversed, or a new trial be granted by any court of this State in any case, civil or criminal, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless, in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

We think the statute can be invoked in the instant case without establishing a dangerous precedent.

The judgment is affirmed, with costs to the appellees.

CLARK, C. J., and McDONALD, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.